32 P.(2d) 755

## CITIZENS' BANK OF CLOVIS v. BROWN.

### No. 3926.

Supreme Court of New Mexico.

April 28, 1934.

Vickers & Campbell, of Lubbock, Tex., and Otto Smith, of Clovis, for appellant.

Carl A. Hatch and Perkins L. Patton, both of Clovis, for appellee.

SADLER, Justice.

■ This appeal involves a claim of equitable assignment based upon transactions to be related in the order of their happening. On March 1, 1925, one R. J. Murray and wife executed and delivered to W. O. Oldham of Dallas, Tex., thirteen series of negotiable promissory notes, with ten notes to each series. Contemporaneously therewith they made and delivered to said payee thirteen separate mortgage deeds, each mortgage covering a separate quarter section of land located in Curry county, N. M., each separate mortgage securing the payment of a separate series of said notes.

Through mesne conveyances ownership of the lands involved some time prior to the date of trial had passed to one R. C. Vinyard and wife. Intervening the two ownerships they had belonged to one P. H. Herndon. While so owned, the latter, joined by his wife, incumbered by two mortgages the same lands covered by the aforementioned mortgages to secure two separate series of notes signed by them aggregating $10,850. These mortgages were, of course, junior to the Oldham mortgages.

Oldham sued to foreclose, joining as defendant, among others, one J. N. Bryant, the then owner of the last eight in point of maturity of the two series of notes, as well as the two mortgages securing same, executed subsequently to the notes and mortgages running to Oldham.

Pending trial and after the filing in said cause of petition in intervention by the appellee, Citizens' Bank of Clovis, asserting

ownership by equitable assignment of an interest in the Oldham mortgages through its claimed status as holder of the first five notes in each of the thirteen separate series of notes executed in favor of Oldham, the appellant, A. B. Brown, became the owner by purchase of the notes and mortgages held by Bryant at the time of the institution of Oldham's suit and was substituted as a defendant in Bryant's stead. Oldham having died pending suit, the cause was revived in the name of his executor.

It appears that the funds with which to meet the principal and interest of the first five notes maturing under the thirteen separate series of what will hereinafter be designated as the Oldham notes were advanced by Citizens' Bank of Clovis, the appellee. It asserted itself to be the holder thereof by purchase, that the indebtedness evidenced by such notes remained unextinguished, and that upon the theory of equitable assignment it was secured to the extent of the notes so held by the lien of the Oldham mortgages as against the subsequent mortgages executed in the meantime by Herndon and wife and owned at the time of trial by the appellant, Brown. It conceded priority of payment to Oldham under his mortgages to the extent of the unpaid notes still held by him.

The appellant, Brown, on the contrary, contended that the moneys received by Oldham from appellee on account of said notes were received in payment thereof and operated to extinguish the indebtedness under the Oldham mortgages to that extent, thus increasing the margin of security remaining to his (Brown's) mortgages.

At the trial the appellee restricted its claim to notes 3, 4, and 5 of each series. Appellee's discovery that payments by Vinyard on account of the advancements made by it to meet said notes almost equaled the amount of notes 1 and 2 is stated in the brief by counsel in explanation of the virtual retraxit entered as to said notes.

The trial court sustained the position of appellee and rejected that of appellant. It found that the moneys paid Oldham by appellee were advancements, not payment of said notes; that appellee was the owner and holder thereof; decreed foreclosure of the Oldham mortgages to satisfy not only the notes 6 to 10, both inclusive, still retained by Oldham's estate in each series, but also notes 3, 4, and 5 of each series held by appellee, but with priority of payment given to the notes held by the Oldham estate. The court also decreed foreclosure of appellant's mortgages. The practical effect of the trial court's decree was a foreclosure of the Oldham and Brown mortgages with the following order of payment, to wit: First, to satisfaction of the five notes of each series held by the Oldham estate; second, to satisfaction of the three notes of each series held by appellee; and, third, the balance then remaining, or so much thereof as necessary, to satisfaction of appellant's notes.

The appellant complains here of failure of the trial court to hold that the Oldham notes in possession of the bank were paid and ex-

tinguished rather than transferred and kept alive. Largely his arguments resolve themselves into the contention that there is no substantial evidence to support a finding of transfer; or, to state it another way, that the trial court should have declared, as a matter of law, on the facts proven, that the notes in question were paid and extinguished.

As we view the matter the decisive question is not so much one of equitable assignment as it is whether a given payment operates to discharge or transfer a promissory note. For, if the payments here shown operated to transfer rather than extinguish the indebtedness evidenced by the notes involved, there can surely be no serious doubt that a proportionate interest in the security passed as an incident to transfer of the debt. What then is the rule applicable? Both parties cite and discuss in their briefs the case of Lee v. Field, 9 N. M. 435, 54 P. 873. In the third paragraph of the syllabus to that case, prepared by the territorial Supreme Court, it is said: "Payment by a stranger to a promissory note of the money due to the holder, without any agreement, express or implied, to purchase the same, extinguishes the note."

Without feeling called upon to determine the distinction urged by appellee, viz. that the court was there dealing with the question in a common-law action without right to heed equitable considerations, we shall examine to ascertain if there is here any substantial evidence to support a finding of transfer as against extinguishment, of "agreement, express or implied, to purchase."

It should be mentioned that the notes were in the hands of the bank unindorsed. This circumstance alone is of slight importance if the evidence supports a finding that there was an intention to transfer. See 1929 Comp. § 27-155. Indeed, it has been held that possession of a note, unindorsed, by one other than the payee or indorsee, affords prima facie evidence that he is the equitable owner. 3 R. C. L. 981, § 190, under topic "Bills and Notes." Cf. Mann v. Whitely, 36 N. M. 1, 6 P.(2d) 468, touching prima facies of possession, as evidence of nonpayment, where note is devoid of indorsements indicating payment.

But the evidence does not here rest upon mere presumption. The first series of notes was due March 1, 1927. A short time after maturity and apparently while remittance to owner was in the mails, according to testimony of the cashier of appellee bank, Oldham called the former over long-distance and carried on a conversation with him over the telephone. The cashier's examination on this subject was as follows:

"A. In that conversation I asked him for permission or an understanding that we would hold those notes uncancelled, because we were making these advances and intended to hold them as collateral.

"Q. Did you tell Mr. Oldham at that time you intended to hold the notes as collateral? A. I did.

"Q. Did he raise any objection? A. He did not.

"Q. If you recall what he said, relate it in substance or detail?

"The Court: That was the first payment?

"Judge Hatch: Yes, he said those notes, but this conversation was after the first note had been paid. They received this note marked paid, and had this telephone conversation then, Mr. Oldham and Mr. Scarda.

"The Court: I understood from the testimony it was before payment of the first note.

"Judge Hatch: Let's straighten that out.

"Q. Explain that? A. My recollection is right after the payment of the first note.

"Q. Why was that? A. If I remember right, correctly, I guess probably the remittance was not coming on the date of maturity, and he called us about the time the note was paid, and I gave him the information we were paying them with the understanding we would hold these notes as collateral, without cancelling them or delivering them.

"Q. Did you ever have any other conversation with Mr. Oldham concerning the other notes? A. Yes, on several occasions."

The first note which reached the bank marked "paid" and the one next maturing are not here involved. It is notes 3, 4, and 5, maturing March 1, 1929, and on the same date in 1930 and 1931, upon which recovery was had. None of them, nor note No. 2, maturing March 1, 1928, bore indorsements of payment or cancellation.

This witness, appellee's cashier, testified to several other telephone conversations with Oldham to the same effect in substance near the due dates and prior to payment of subsequently maturing notes. In one such conversation he says he gave Oldham to understand that, although holding the notes uncanceled, the bank would yield priority of payment to Oldham's uncollected notes.

That knowledge of the manner in which the bank was handling the notes was brought home to Oldham is conclusively shown by his letter to the bank of March 21, 1929, in which he inquired: "Would like for you to advise if these notes and those sent you for collection on same party last year are being paid and cancelled or are you or any bank or person taking them over and holding them." To which the bank replied: "The present owner of the land is Mr. R. C. Vinyard, and we are at the present time holding the notes you sent last year and this year."

Absent showing of any other reason prompting Oldham to make this inquiry, it is not unreasonable to relate it to the telephone conversation two years previously as detailed by the cashier and a present desire for certain information whether the plan proposed was being followed. Certain it is, the record fails to disclose any objection or protest from Oldham, either verbally or in writing, to the bank's holding the paper, although they had correspondence near due date of the notes in each of the two years following this exchange of correspondence.

In view of all this, we are unable to say the evidence of Oldham's implied consent to the bank to take over and carry the notes is unsubstantial. It is undisputed that appel-

lee advanced the money to meet every one of the notes involved. It was agreed by Herndon when the first note matured and by Vinyard when he became the party concerned, that the bank should hold the notes uncanceled until repayment of the moneys advanced to meet them.

The mere circumstance that Oldham, in transmitting the notes to the bank near their due dates, as stated in one letter, sent them "for collection," and that ordinarily he used language reflecting the thought that they would be met by Vinyard, does not greatly argue that he was unwilling for the bank to become their holder if Vinyard did not pay them. At least, the weight to be attached to this evidence was for the trial court to determine.

If the notes were transferred, instead of becoming extinguished, the bank was, of course, entitled to the benefit of the security in which they shared, and might have been entitled, but for voluntarily yielding priority of payment to Oldham, to have had its notes stand on a parity with his. This question, however, not being before us, we do not decide.

■ The next point for decision in orderly sequence is whether certain material evidence upon which the finding of transfer is predicated was admissible. We refer to appellant's objection to the cashier's testimony giving details of the telephone conversation with Oldham shortly after payment of the first note. Oldham was dead at the time of trial, and it was objected both that the statements of the cashier to him were self-serving declarations, an objection without merit, and that the conversation, as a basis for recovery, was within the interdiction of the statute, 1929 Comp. § 45-601, touching the effect of evidence of matters transpiring before the death of deceased persons, in any suit by or against the heirs, executors, etc., of the decedent.

The trial court took the view, in which we are disposed to concur, that, there being no controversy between Oldham's executor and appellee, the statute was without application. Oldham's estate did not interest itself in the controversy between the intervener, appellee, and appellant. The controversy between them was a suit within itself. The occasion for invoking the statute being nonexistent, it was for that reason if for no other properly denied application.

If the telephone conversations were eliminated entirely, there still would be ample evidence to support a finding of implied consent on Oldham's part to a transfer of the notes maturing in 1930 and 1931. His written inquiry and the bank's response, supra, plus absence of any protest from him as to the course being pursued, and of which he was advised, would alone furnish substantial support for the finding.

The last point urged is that, since the bank's cashier in his testimony referred to the notes held by it as "collateral," its right to claim under an equitable assignment was defeated. The argument runs that, if the bank purchased the notes, it owned them, Vinyard owed it nothing on account thereof, and there was no debt to which the notes

could be deemed collateral. We do not see how the argument aids appellant. It presupposes ownership of the notes by the bank. When ownership arises, the appellant's claim falls. Moreover, the trial judge indicated by comment at the trial his understanding that the term "collateral" was used by the witness in a loose sense. We think the point is without merit.

It follows from what has been said that the judgment of the lower court should be affirmed, and it is so ordered.

WATSON, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.