IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: December 20, 2017

**NO. A-1-CA-35247**

**WANDA COLLINS, as Personal Representative of the ESTATE OF WILLIAM "MACK" VAUGHAN,**

Plaintiff-Appellant,

v.

**ST. VINCENT HOSPITAL, INC.,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sarah M. Singleton, District Judge**

Stephen Durkovich
Santa Fe, NM

Hunt & Marshall
Lee R. Hunt
Santa Fe, NM

Cohen and Zedalis, LLC
Seth T. Cohen
Santa Fe, NM

for Appellant

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Emil J. Kiehne
Elizabeth A. Martinez
Albuquerque, NM

for Appellee

**_____OPINION**

**SUTIN, Judge.**

{1}     The simple question in this unnecessarily complicated and convoluted direct liability action is whether the jury's determination that a hospital's negligence was not a cause of the death in question must be reversed based on district court instruction-related error. We hold that the court did not err, and we uphold the jury's verdict and the court's judgment dismissing Plaintiff's claim.

**BACKGROUND**

**Pertinent Medical History**

{2}     William "Mack" Vaughan presented at the emergency department of Defendant St. Vincent Hospital, Inc. (the Hospital) in Santa Fe, New Mexico in August 2002 with complaints of abdominal pain. He was seen in the emergency department by Dr. Martin Wilt, who was a subcontractor/partner of Northern New Mexico Emergency Medical Services, and who ordered a CT scan. The scan was reviewed by Dr. J.R. Damron, a radiologist and employee of Santa Fe Radiology, who concluded that the most likely diagnosis was a diverticular abscess in the colon, but it was also possible that Vaughan had a neoplasm, which is cancer. Dr. Wilt consulted with Dr. Anna Voltura, a surgeon, to evaluate Vaughan. Dr. Voltura's working diagnosis was diverticular abscess. She recommended that Vaughan be admitted and placed on IV

antibiotics. Vaughan refused, saying that he wanted to go home, and upon discharge, he was prescribed antibiotics. Vaughan was instructed to follow up with Dr. Voltura in one week for any problems. Vaughan was advised that he would need surgery in the future, and Dr. Voltura warned Vaughan that his condition was serious and that he could potentially die if it were left untreated.

{3}     Dr. Damron dictated a CT scan report, and the report was transcribed the next day. The written report contained Dr. Damron's findings that "[m]ultiple diverticula in the sigmoid colon are present. . . . An abscess associated with a diverticulitis would be a first consideration with neoplasm as the etiology being the second consideration." Drs. Voltura and Wilt testified that they did not recall seeing or receiving copies of Dr. Damron's written report. Vaughan left the Hospital without being told that he had a possible neoplasm in his colon.

{4}     Despite Dr. Voltura's instructions, Vaughan did not follow up with Dr. Voltura. In September 2002, he visited the Veterans Administration hospital in Albuquerque, New Mexico, complaining of foul-smelling, cloudy, burning urination, but he declined an x-ray. He visited the Veterans Administration hospital again in November 2002 to establish a primary care provider, on which visit a colonoscopy was recommended but apparently not performed.

{5}     In April 2003, Vaughan presented at the Hospital's emergency department with complaints of brown, foul-smelling, gritty material in his urine and with symptoms similar to those he had in October 2002, including burning with urination. While at the emergency room in April 2003, he was advised to follow up with a urologist, but he did not do so. In May 2003, the Veterans Administration sent Vaughan a letter advising him that additional tests were recommended for his continuing urinary tract infections, including a cystoscopy. No evidence indicates that Vaughan went in for those tests at that time.

{6}     In August 2003, Vaughan returned to the Hospital's emergency room, complaining again of painful urination and also complaining of abdominal pain at which time he underwent a cystoscopy that revealed a colovesical fistula. Vaughan was ultimately diagnosed in October 2003 with colon cancer in the sigmoid colon at the location of the abscess. Vaughan died in 2010 of a metastatic lesion, with colon cancer listed as the "[d]isease or injury that initiated events resulting in death[.]"

**The Lawsuit**

{7}     Years before his death, in January 2006, Vaughan sued the Hospital pursuant to a complaint for medical negligence, averring the Hospital's negligent failure "through an administrative inadequacy to forward [a] radiology report[,]" indicating the existence of a neoplasm, on to his physician.

3

**{8}** The case was first before this Court in *Vaughan v. St. Vincent Hospital, Inc.*, No. A-1-CA-30395, 2012 WL 1720346, mem. op. (N.M. Ct. App. Apr. 16, 2012) (non-precedential). In *Vaughan*, we affirmed the district court's summary judgment dismissal of Vaughan's complaint on the ground that he failed to give sufficient notice under Rule 1-008 NMRA of assertion of a claim of apparent agency giving rise to vicarious liability of the Hospital. *Id.* at \*1, \*8. After Vaughan passed away in 2010, Diego Zamora, as personal representative of Vaughan's estate, was substituted as the plaintiff. Our Supreme Court reversed the *Vaughan* decision in *Zamora v. St. Vincent Hospital*, 2014-NMSC-035, ¶ 1, 335 P.3d 1243, holding that "Vaughan's complaint adequately notified [the Hospital] that one or more of its employees or agents was negligent[.]"

**{9}** More specifically, in *Zamora*, our Supreme Court stated that "Vaughan's pleading was sufficiently detailed to put [the Hospital] on notice of a claim of apparent agency or vicarious liability related to the failure to communicate his cancer diagnosis," *id.* ¶ 8, and that nothing in our rules or statutes "require[d] a civil complaint to specifically recite reliance on theories of vicarious liability or apparent agency in order to provide fair notice of a cause of action." *Id.* ¶ 14. Our Supreme Court concluded its opinion stating that the "complaint adequately notified [the Hospital] that it was liable for the negligence of one or more of its agents" and that

4

disputed issues of fact existed "concerning the negligence of [the Hospital's] agents in failing to communicate [a] cancer diagnosis to Vaughan or his treating doctor." *Id.* ¶ 34. Our Supreme Court remanded for trial on the merits. *Id.*

**The District Court Proceedings on Remand**

{10} On remand, and re-captioned with a substituted personal representative, Wanda Collins, Plaintiff changed course as to the nature of the claim—she was no longer claiming or asserting any negligence on the part of any of the physician providers involved, Drs. Wilt, Damron, and Voltura. Plaintiff chose not to pursue vicarious liability against the Hospital, but chose instead to pursue a direct liability claim based solely on negligence of the Hospital stemming from alleged communication, operational, and systemic failures.

{11} Plaintiff's direct liability theory was expressed in different ways at different intervals. But as stated in the district court's pretrial order, Plaintiff did not contend that Drs. Voltura, Wilt, or Damron were negligent, but only the Hospital was negligent by its failure to deliver the report of Vaughan's CT scan results to Vaughan, Dr. Wilt, and Dr. Voltura. At trial, Plaintiff contended that she did not allege "that any of the physicians did anything wrong" but that the Hospital was liable based on a number of systemic and communication failures. The Hospital's defense to Plaintiff's contention was that Vaughan's cancer did not progress from August 2002 to October

2003, and any delay in treatment was caused by Vaughan's repeated failures to heed medical advice.

{12}     Although many of the jury instructions were settled prior to trial, at a mid-trial jury instruction conference, the district court considered whether to give an apparent agency instruction based on UJI 13-1120B NMRA and *Houghland v. Grant*, 1995-NMCA-005, 119 N.M. 422, 891 P.2d 563, that "[a] hospital is responsible for the actions of health care providers who are not hospital employees[.]" According to Plaintiff, it was a "general proposition" that a hospital is "on the hook" because the physician providers are apparent agents, and that the hospital is on the hook for their actions. The court rejected Plaintiff's position because Plaintiff was not claiming that the providers made "any bad medical decisions." Plaintiff disagreed, stating that the Hospital was "broadly" responsible for the failures of the apparent agent providers who are part of the failed system, including bad medical decisions not constituting negligence. The district court ultimately determined that it was going to give the apparent agency instruction only if it was limited for the purposes of considering whether to award punitive damages and limited to "consideration of the cumulative conduct of its employees or apparent agent[.]"[1]

---

[1] This limitation was based on this Court's opinion in *Grassie v. Roswell Hospital Corp.*, 2011-NMCA-024, ¶¶ 30-32, 150 N.M. 283, 258 P.3d 1075. In *Grassie*, we held that the cumulative conduct theory, which "provides that an award

6

{14} In closing arguments, Plaintiff again focused on her theory that the Hospital negligently failed to deliver Dr. Damron's final report to Vaughan's treating physicians and to Vaughan. In its closing argument, the Hospital argued that it was not negligent because its system for delivering reports complied with the industry standards, was sufficient, and worked in practice. The Hospital noted the stipulation that Dr. Damron was not negligent, but indicated nevertheless that Dr. Damron was the cause of Vaughan not getting the information about a possible neoplasm. In Plaintiff's closing rebuttal, Plaintiff again stressed the failure to deliver the report and argued, "[i]t wasn't Dr. Damron's job to take that report and walk it down the hall. [The] Hospital set up the system."

{15} After closing arguments, the jury was given the following relevant instructions, beginning with Instruction No. 2:

> In this case, [Plaintiff] . . . seeks damages from the [Hospital] for damages that [P]laintiff says were caused by the negligence of [the] Hospital.

---

of punitive damages against a corporation may be based on the actions of the employees viewed in the aggregate in order to determine whether the employer corporation had the requisite culpable mental state because of the cumulative conduct of the employees[,]" was supported by New Mexico law. *Id.* ¶ 30 (alterations, internal quotation marks, and citation omitted). On appeal, Plaintiff does not argue that *Grassie* is incorrect or that it would not apply in this case, but rather that a general apparent agency instruction should have been given.

To establish [the Hospital's] negligence, [Plaintiff] has the burden of proving that [the Hospital] negligently did not deliver Dr. . . . Damron's final written report of the August 8 CT examination of . . . Vaughan identifying a pelvic abscess the result of either diverticulosis or a neoplasm to at least one of the following:

> To . . . Vaughan's ER physician Dr. . . . Wilt for Dr. Wilt's use in diagnosing and treating Vaughan, or

> To . . . Vaughan's surgeon Dr. . . . Voltura for use in diagnosing and treating . . . Vaughan, or

> Alternatively, [Plaintiff] has the burden to prove that because of [the Hospital's] negligence there was a failure to communicate the information contained in Dr. Damron's final written report about a possible neoplasm to . . . Vaughan for his own use in deciding what kind of care he should obtain to address the possibility that his abscess was the result of a neoplasm or cancer.

[Plaintiff] has the burden of proving [the Hospital's] negligence was a cause of his death, his injuries[,] and damages.

The [Hospital] denies . . . [P]laintiff's allegations regarding negligence. [The Hospital] asserts that it exercised the knowledge, skill, and care of a reasonably well[-]qualified hospital in its care and treatment of . . . Vaughan. [The Hospital] denies that it failed to deliver the August 8, 2002 CT report to Dr. Wilt and further denies that it failed to deliver a copy of the August 8, 2002 CT report to Dr. Voltura. [The Hospital] denies that it was obligated to deliver a copy of the report to Dr. Voltura without express indication from Dr. Damron. [The Hospital] denies that it failed to deliver a copy of the report to . . . Vaughan and states that . . . Vaughan would have received a copy of his records if he had asked for them. [The Hospital] also denies that it created the appearance that Drs. Wilt or Damron were its employees or apparent agents and denies that [it] is responsible for their conduct. [The Hospital] denies . . . [P]laintiff's claims that it caused or contributed to . . . Vaughan's death, injuries[,] and damages.

8

[The Hospital] affirmatively states that . . . Vaughan was negligent and that his negligence was a cause of his death, injuries[,] and damages. The [Hospital] has the burden of proving that . . . Vaughan failed to exercise a duty of ordinary care and that his negligence caused his injuries and damages. To establish that . . . Vaughan was negligent, [the Hospital] has the burden of proving at least one of the following:

a. . . . Vaughan unreasonably declined admission to [the Hospital] for further work-up and treatment on August 8, 2002;

b. . . . Vaughan unreasonably failed to follow the discharge instructions provided to him by [the] Hospital and Dr. Voltura on August 8, 2002;

c. . . . Vaughan unreasonably failed to obtain recommended medical care by his health care providers at the Veteran[s] Administration;

d. . . . Vaughan unreasonably failed to obtain recommended medical care by his health[]care providers at [the] Hospital after August 8, 2002.

The [Hospital] also has the burden of proving that such negligence by . . . Vaughan was a cause of his death, injuries[,] and damages.

The district court also gave a causation instruction, Instruction No. 5, that read:

An act or omission is a "cause" of injury if it contributes to bringing about the injury, and if injury would not have occurred without it. It need not be the only explanation for the injury, nor the reason that is nearest in time or place. It is sufficient if it occurs in combination with some other cause to produce the result. To be a "cause[,"] the act or omission, nonetheless, must be reasonably connected as a significant link to the injury.

{16} The court also gave the following punitive damages instruction, Instruction No. 12, as discussed during the mid-trial jury instruction conference, relating to a hospital's responsibility for non-employee cumulative conduct.

> For purposes of considering whether to award punitive damages against [the] Hospital, a hospital is responsible for the cumulative conduct of health care providers who are not [H]ospital employees, such as Dr. . . . Wilt and Dr. . . . Damron, if the [H]ospital, through its conduct, created the appearance that it was the provider of these services to the public.

{17} Although the application of apparent agency principles had been discussed by the parties prior to jury deliberations, the issues giving rise to this appeal truly began after the jury was instructed. During its deliberations, the jury submitted the following handwritten question, entitled "Jury instruction 14 [and] 17 vs. 19."

> [Instruction No.] 14=refers to doctors
> [Instruction No.] 17=refers to physicians
> [Instruction No.] 19=officers [and] employees
>
> Are the physicians/doctors considered employees or officers of St. Vincent Hospital?

Instruction No. 14 stated, "The [H]ospital is not liable when following the orders of the doctor unless the [H]ospital knew or in the exercise of ordinary care should have known that the orders of the doctor were in error and failed to call the error to the doctor's attention." Instruction No. 17 stated, "Where [there] is more than one medically accepted method of diagnosis and treatment, it is not negligent for a

physician or a hospital to select any of the accepted methods." Instruction No. 19 stated, "[The Hospital] can only act through its officers and employees. Any act or omission of an officer or an employee of a corporation within the scope or course of his employment is the act or omission of the corporation."

{18}     After receiving the jury's question, the following discussion between the court and counsel occurred:

> [Plaintiff's counsel]: That's what [*Houghland*] was for. In the [court's *Houghland*] instruction,[2] though, it was limited to cumulative conduct under punitives. So we raised the issue when this was coming up that there could be other instances again where they would question the liability of the hospitals for these people. So under [*Houghland*] again, I think that they are—that's the whole purpose of [*Houghland*].

> [The Court]: Well, wouldn't I have to tell them, if you find the physicians or doctors are either employees or apparent agents of [the Hospital], then they are considered employees or officers?

> [Plaintiff's counsel]: Yes.

> [Defendant's counsel]: Well, first of all, there is a difference between physicians slash doctors and officers, but on this issue, the—

> [The Court]: I guess it would only be—they could only possibly be considered employees. They are not officers.

> [Defendant's counsel]: And you gave the [*Houghland*] instruction only as to punitive damages, not as to negligence.

---

[2] The "*Houghland* instruction" is Plaintiff's wording for UJI 13-1120B. *See* UJI 13-1120B comm. cmt. (indicating that the instruction's language is derived from *Houghland*).

11

[The Court]: Right.

[Defendant's counsel]: So I think they need to be told that.

[The Court]: Okay. All right. Okay. So it seems then I should say that all the parties have stipulated that no doctor was negligent. For purposes of punitive damages, if you consider the doctors to be—if you find the doctors to be employees or the apparent agents of [the] Hospital, then you may consider them employees of [the] Hospital.

[Plaintiff's counsel]: No.

[The Court]: Why not?

[Plaintiff's counsel]: Why not? Because of the fact that what [*Houghland*] says is [*Houghland*] says that a hospital is responsible for the actions of its apparent agent, and it is not limited to negligent actions, it's all of their actions.

So the way you stated it initially, that's the way you have to instruct it, Your Honor. It isn't limited to negligent actions . . . .

The court reminded Plaintiff that she had stipulated that the doctors were not negligent and thus could not "rely on the doctor's negligence to form the basic compensable damage claim." According to the court, "[t]here has never been a case which says [that a hospital is] responsible for compensatory damages on account of non-negligent acts of . . . physicians who are not [hospital] employees." Therefore, the court responded to the jury's question as follows:

Only for purposes of considering whether to award punitive damages may you determine whether the doctors/physicians are employees or apparent agents of [the Hospital]. See Instruction 12.

12

The following morning, Plaintiff opened with a request that the court give another instruction.

> Judge, I'm sorry, if we might there is one issue I would like to raise to the [c]ourt briefly. I know it's a busy morning and all that, but as this case has gone on what we—and in particular what raised this issue was the question yesterday about agency and about employees and those issues. I mean, certainly as we have thought about it our request is the [c]ourt submit a separate answer to that question which is essentially the [13-1120B] instruction on when a hospital is responsible for the conduct of apparent agents.

> And I know that the [c]ourt did not originally give the instruction as it is in the UJI based on [P]laintiff's stipulation, and that was the reason that the [c]ourt didn't do that, and certainly that was understood. But the case has been presented in such a way that [the Hospital has] raised that issue clearly and soundly throughout the trial and certainly throughout closing argument, and clearly that is an issue that the jury is grappling with.

> So apart from what we said, the issue has been presented to them and I think squarely the appropriate instruction for them is the instruction from [13-1120B] and I think the way it would be presented now is as an answer to the question that was submitted.

> And so we would like to tender that and request that the . . . [c]ourt give that as an answer to [the jury's question] or as a supplemental instruction, [h]owever the [c]ourt views that most appropriate.

Plaintiff requested that the following written instruction be given to the jury:

> A hospital is responsible for injuries proximately resulting from the conduct of health care providers who are not [H]ospital employees, such as . . . Dr. Damron and Dr. Wilt, if the [H]ospital, through its conduct, created the appearance that it was the provider of these services to the public.

This was the first time Plaintiff tendered such an instruction. It was tendered as a UJI 13-1120B instruction, substituting "conduct" for "negligence" to set out "when a hospital is responsible for the conduct of apparent agents."

{19} The district court refused Plaintiff's tendered instruction, stating:

You could have tried the case where you took the position that either [Dr.] Damron or the ER doctor was negligent and an apparent agent of the [H]ospital. You chose not to do that. You have decided for strategic reasons that you didn't want to raise that issue, you didn't ask for [an 1120B] on the whole case at the time we were doing instructions. It's too late now to change in mid stream when the jury already has the case as you presented it. Your request is denied.

The court described the proposed instruction as "too little, too late."

{20} The special verdict form given to the jury asked whether the Hospital was negligent, to which the jury answered, "Yes." The form further asked, "Was any negligence of [the] Hospital a cause of . . . Vaughn's injuries and damages[,]" to which the jury answered, "No." Based on the jury's lack of causation determination, the district court entered judgment in favor of the Hospital and against Plaintiff. This appeal followed.

**DISCUSSION**

{21} Plaintiff asserts that the "appeal raises a single fundamental substantive issue. Is a hospital's direct liability for the conduct of its apparent agents limited to only their 'negligent' conduct?" (Footnote omitted.) Plaintiff argues that (1) she preserved

14

her claim of error as to the apparent agency instruction; (2) the district court erred in not giving a broad apparent-agency instruction because all conduct of a hospital's apparent agents, acting within the scope of their authority, including non-negligent conduct, is attributable to a hospital in determining a hospital's direct liability; and (3) the record provides evidence that the jury was confused and wrongly concluded that the Hospital did not cause Vaughan's injuries. The Hospital does not address Plaintiff's preemptive preservation argument, and because we ultimately hold that the district court did not err and affirm the verdict, we also choose not to address any preservation issues.[3] We therefore focus on whether the district court erred in refusing the instruction and whether the instruction led to an erroneous jury verdict.

{22}    "We review a district court's refusal to give a proffered instruction de novo to determine whether the instruction correctly stated the law and was supported by the evidence presented at trial." *Holcomb v. Rodriguez*, 2016-NMCA-075, ¶ 16, 387 P.3d 286 (internal quotation marks and citation omitted). "If instructions, considered as a whole, fairly present the issues and the law applicable thereto, they are sufficient.

---

[3] Although we address the merits of Plaintiff's arguments on appeal, we are concerned with counsel's failure to specifically object to the instructions at the time the instructions were being settled, and with the late proffer of Plaintiff's modified UJI 13-1120B instruction in response to the jury's question. That said, because the applicability of apparent-agency principles was discussed generally, we reach the issue.

15

Denial of a requested instruction is not error where the instructions given adequately cover the issue." *Sonntag v. Shaw*, 2001-NMSC-015, ¶ 15, 130 N.M. 238, 22 P.3d 1188 (internal quotation marks and citation omitted). "A trial court's refusal to submit a jury instruction is not error if the submission of the instruction would mislead the jury by promoting a misstatement of the law." *State v. Nieto*, 2000-NMSC-031, ¶ 17, 129 N.M. 688, 12 P.3d 442.

{23}     *Houghland*, involving the issue of a hospital's vicarious liability for the negligent actions in its emergency room, 1995-NMCA-005, ¶¶ 2-3, addresses apparent agency and hospital vicarious liability. *Houghland* was an interlocutory appeal involving the issue of a hospital's vicarious liability for the negligent actions in that hospital's emergency room. The doctor, Dr. Grant, was employed by a separate company that had a contract with the hospital to staff its emergency room. *Id.* ¶ 4. Dr. Grant had no contract with the hospital. *Id.* ¶¶ 4, 7. The plaintiff argued that the district court erred in granting summary judgment in favor of the hospital on the issue of vicarious liability, because a genuine issue of material fact existed as to whether Dr. Grant was an agent or apparent agent of that hospital. *Id.* ¶¶ 6-7. The plaintiff contended that the doctrine of apparent authority applied to establish liability under respondeat superior. *Id.* ¶ 13. This Court determined that "the district court erred in granting summary judgment in [the hospital's] favor." *Id.* ¶ 25.

{24} A few years after *Houghland* was decided, UJI 13-1120B entitled "Hospital Vicarious Liability; Non-Employees" was adopted. It reads:

> A hospital is responsible for injuries proximately resulting from the negligence of health care providers who are not hospital employees, such as [emergency room physicians, if they are the hospital's apparent or ostensible agents], if the hospital, through its conduct, created the appearance that it was the provider of these services to the public.

UJI 13-1120B (bracketed material out of committee commentary). The committee commentary relating to UJI 13-1120B reads:

> A hospital is liable for the negligence of independent contractors who provide patient care in the hospital, such as emergency room physicians, if they are the hospital's apparent or ostensible agents. *See Houghland*[, 1995-NMCA-005, ¶¶ 22-24] (discussing factors from which jury could conclude that hospital created reasonable belief that emergency room physician was hospital's employee or agent including the use of non-employee doctors to further the hospital's business of providing services directly to the public and the choice of the doctor being controlled by the hospital and not the patient.) Although *Houghland* arose in the context of a full service emergency room, the instruction could be applicable to other services provided by the hospital.

{25} On appeal, Plaintiff's point is that the district court erred in failing to present the theory of her case to the jury through a modified UJI 13-1120B that was offered by Plaintiff during jury deliberations, which would have changed "negligence" to "conduct."

{26} Plaintiff asserts that her tendered instruction was necessary because the court allowed the Hospital to argue to the jury that Dr. Damron's failure to expressly "cc"

17

his radiology report to Dr. Voltura was the cause of Vaughan's death. Plaintiff further argues that UJI 13-1120B as it reads "is simply incorrect" because the "[negligence] limitation" does not exist in the law. Plaintiff not only rejects any provider negligence limitation in the instruction itself, she also rejects as incorrect the committee commentary that, under *Houghland*, "[a] hospital is liable for the negligence of independent contractors who provide patient care in the hospital, such as emergency room physicians, if they are the hospital's apparent or ostensible agents." UJI 13-1120B comm. cmt.

{27} In support of this position, Plaintiff relies on *Zamora*'s "law of the case," quoting the statement in *Zamora* that "[u]nder *Houghland*, a malpractice claim arising from care in a hospital emergency room implicates the hospital in the actions of any employees or agents—known or unknown to the plaintiff—who took part in that care." *Zamora*, 2014-NMSC-035, ¶ 18. Plaintiff weaves into the analysis an "attribution" argument through theories of apparent authority and agency that she contends made Dr. Damron's conduct attributable to the Hospital. Plaintiff first draws on UJI 13-408 NMRA, which Plaintiff did not request be given to the jury, and which reads:

> The defendant . . . may, if there has been no actual employment, with right to control, nonetheless be liable for the acts or omissions of [an apparent employee.]

Plaintiff argues that this instruction "demonstrates that a principal's responsibility for apparent agency includes non-negligent conduct because it does not limit a principal's liability to the negligent conduct of its apparent agents." Plaintiff then draws on the Restatement (Third) Agency as supporting UJI 13-408. According to Plaintiff, "[w]hen the principal is an organization that can act only through its agents, the result is that '[a]n organization's tortious conduct consists of conduct by agents of the organization that is attributable to it.' " (Quoting Restatement (Third) of Agency § 7.03 cmt. c (2006).) "[A]n organization would breach its duty of reasonable care through the action or inaction of its employees and other agents, including the prescription and enforcement by managerial agents of directives and guidelines to be followed by other agents." Restatement, *supra*. Based on these authorities, Plaintiff argues that

> [Dr.] Damron, while acting as an apparent agent of [the Hospital], might not have been personally negligent in the manner in which he dictated his report, yet his uninstructed conduct in not expressly noting for the transcriptionist specifically who the report was to be delivered to was nevertheless the immediate cause of Vaughan's death—conduct New Mexico law attributes to [the Hospital].

Further, Plaintiff argues that the attribution of an apparent agent's conduct to the principal is an integral part of New Mexico law as evidenced by holdings in cases addressing apparent agency outside of the medical negligence arena. *See, e.g.*, *Tabet v. Campbell*, 1984-NMSC-059, ¶ 9, 101 N.M. 334, 681 P.2d 1111 (addressing a tax

19

collection issue and holding that "[a] principal is bound by the actions taken under the apparent authority of its agent if the agent is in a position which would lead a reasonably prudent person to believe that the agent possessed such apparent authority"); *Fryar v. Emp'rs Ins. of Wausau*, 1980-NMSC-026, ¶ 6, 94 N.M. 77, 607 P.2d 615 (addressing a broker's modification to an insurance contract); *Ronald A. Coco, Inc. v. St. Paul's Methodist Church of Las Cruces, N.M., Inc.*, 1967-NMSC-138, ¶¶ 1, 4, 78 N.M. 97, 428 P.2d 636 (addressing an action to foreclose a materialman's lien).

{28} Plaintiff also relies on the Restatement (Second) of Agency Section 213 (1958) that reads in part:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent . . . :
>
> > (a) in giving improper or ambiguous orders or in failing to make proper regulations[.]

{29} Plaintiff concludes her apparent authority/attribution arguments asserting that the district court "fail[ed] to perceive the difference between vicarious and direct liability" and thereby "failed to comprehend that [Dr.] Damron's conduct, whether or not rising to the level of negligence, was nonetheless attributable to [the Hospital] for [the] purpose of determining whether [the Hospital's] direct negligence in failing to

20

supervise or control [Dr.] Damron's dictating convention was a cause of Vaughan's death." And Plaintiff states,

> The bottom line is this. New Mexico law is that an apparent agent's actions, such as [Dr.] Damron, in carrying out the principal's duties, without limitation are deemed to be the acts of [the Hospital]. [The Hospital] insists that [Dr.] Damron's acts were the cause of Vaughan's death. The law of logic and the law of agency combine to close the syllogism: Because [the Hospital] conceded that [Dr.] Damron's acts were the cause of Vaughan's death, and because [Dr.] Damron's actions in [the Hospital's] ER system are in legal contemplation the acts of [the Hospital], [the Hospital] was the cause of Vaughan's death.

{30} We are not persuaded by any of Plaintiff's arguments that her proffered instruction was appropriate in this case. Plaintiff's main point is that an overall broader apparent agency instruction, without limitation, was needed. Plaintiff relies on *Houghland* and *Zamora*. *Houghland* does not assist Plaintiff. *Houghland* was a vicarious liability case that evaluated the appropriateness of summary judgment on the issue of a hospital's vicarious liability for an apparent agent-doctor's alleged negligence. 1995-NMCA-005, ¶ 2. In *Houghland*, in contrast to the case here, there was no stipulation by the parties that the doctor, whose conduct was at issue, was not negligent. Because the issue in *Houghland* was apparent agency for a vicarious liability claim based on the doctor's negligence, it has no application here where the issue is apparent agency liability for non-negligent conduct. *See Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22

21

("[C]ases are not authority for propositions not considered." (internal quotation marks and citation omitted)).

{31}     We are also not persuaded by Plaintiff's interpretation of *Zamora*. Although *Zamora* states that under *Houghland* "a malpractice claim arising from care in a hospital emergency room implicates the hospital in the actions of any employees or agents—known or unknown to the plaintiff—who took part in [the] care[,]" we remind Plaintiff that the issue being addressed in *Zamora* was whether there was sufficient information in the complaint to notify the hospital "that one or more of its employees or agents was negligent[.]" 2014-NMSC-035, ¶¶ 1, 18. Thus, as in *Houghland*, the Court in *Zamora* was considering the viability of a vicarious liability claim based on the doctor's negligence, not a direct liability claim based on apparent agency principles and based on the non-negligent conduct of the apparent agent. The passage in *Zamora* cited by Plaintiff is impermissibly taken out of context. *Zamora* is not in any sense about the issue Plaintiff raises. The passage does not, as Plaintiff exaggerates, state clearly or plainly that "negligence" is to be replaced by "conduct."

{32}     We also reject Plaintiff's attempt to expand a hospital's medical negligence liability through tying in UJI 13-408, the Restatement (Third) of Agency Section 7.03 principal's responsibility for an apparent agent's conduct, and the case law on apparent agency in non-medical negligence contexts. Those provisions are nowhere

22

in New Mexico law given or intended to be given transformative powers to create new law and liability in the body of medical malpractice, much less as to direct hospital liability for the non-negligent acts of a non-employee. This case was not tried on Plaintiff's apparent agency and attribution theory, and the authorities Plaintiff now, for the first time, cites and argues for support of her late-developed theory, were never brought to the attention of the district court either by way of offered instructions or argument against the court's instructions. We agree with the district court's assessment that "[t]here has never been a case which says [that a hospital is] responsible for compensatory damages on account of non-negligent acts of the physicians who are not [that hospital's] employees[,]" and any expansion of law and liability as desired by Plaintiff must come, if at all, from a public policy-based decision of our Supreme Court.

{33}     Even were we to assume that a direct liability medical negligence claim against a hospital based on the conduct of an apparent agent might be viable under some circumstances in New Mexico law, we nevertheless agree with the district court's decision not to give the instruction in this case because such an instruction was not supported by the case presented. The case presented to the jury couched liability in terms of system failures, not based on Dr. Damron's alleged failures. Plaintiff argued at trial that the Hospital was at fault for failing to deliver the report and argued "[i]t

23

wasn't Dr. Damron's job to take that report and walk it down the hall." Plaintiff's case was tried based on her strategy of admitting that Dr. Damron was not negligent. Given this approach by Plaintiff at trial, the district court did not err in refusing to give the instruction. *State ex rel. State Highway Dep't v. Strosnider*, 1987-NMCA-136, ¶ 14, 106 N.M. 608, 747 P.2d 254 ("A party is entitled to have the jury instructed upon all correct legal theories of his case when the instruction comes within the ambit of the pleadings and there is evidence to support it. A proffered instruction, however, must be in accord with the evidence and constitute a correct statement of the law." (citations omitted)).

{34}     Plaintiff nevertheless argues the record indicates that, as a result of the refusal to give the instruction, the jury was confused about causation and erroneously concluded that the conduct of Dr. Damron was the sole cause of Vaughan's death. Plaintiff looks to the lack of an instruction on apparent agency in Instruction Nos. 2, 12, and 19, coupled with alleged confusion expressed in the jury question. Plaintiff's causation position hangs on her assertion that the "court allowed [the Hospital] to assert that [Dr.] Damron was the sole 'cause' of Vaughan's injuries and death[.]" And Plaintiff complains that the court "then forbade the jury from finding that the [H]ospital was responsible for [Dr.] Damron's immediate actions in doing so[.]" Thus, according to Plaintiff, forbidding the jury from considering Dr. Damron as the

24

Hospital's apparent agent compelled the jury to reach a "no causation" verdict, and as the "last word" on apparent agency given to the jury during its deliberations, affected the jury's ultimate decision and "functionally amounted to the grant of a directed verdict for [the Hospital]."

{35} Plaintiff essentially hangs her hat on what she believes was "[t]he powerfully persuasive impact of [the] supplementary instruction" given by the district court in response to the jury's question that led the jury to an allegedly erroneous conclusion. In support of her position, Plaintiff cites *Arroyo v. Jones*, 685 F.2d 35, 39 (2d Cir. 1982), that stated:

> A supplemental charge must be viewed in a special light. It will enjoy special prominence in the minds of the jurors for several reasons. First, it will have been the most recent, or among the most recent, bit of instruction they will have heard, and will thus be freshest in their minds. Moreover, it will have been isolated from the other instructions they have heard, thus bringing it into the foreground of their thoughts. Because supplemental instructions are generally brief and are given during a break in the jury's deliberations, they will be received by the jurors with heightened alertness rather than with the normal attentiveness which may well flag from time to time during a lengthy initial charge. And most importantly, the supplemental charge will normally be accorded special emphasis by the jury because it will generally have been given in response to a question from the jury.

{36} We are not persuaded. Neither the jury's question, nor the refusal to give Plaintiff's tendered instruction, nor the court's instruction given in answer to the question, can reasonably be considered a persuasive directive to the jury to find that

the Hospital's negligence did not cause Vaughan's death. As stated throughout this opinion, the theory of Plaintiff's case was based on the Hospital's direct negligence from administrative failure as causing Vaughan's death. Plaintiff had and took every opportunity to argue to the jury that it was the Hospital's systemic failure that affected Dr. Damron's actions or failures to act with respect to his report. There exists substantial evidence in the record from which the jury could have reasonably concluded that Vaughan's death was fully caused by conduct other than the Hospital's administrative failure to have the protocols Plaintiff argued were necessary.

{37}     This case was fully and fairly tried by skilled, competent counsel, based on their claims, defenses, and trial strategies. Again, Plaintiff had every opportunity to argue the Hospital's negligent failure to establish protocols for Dr. Damron, as well as every opportunity to attempt to build a case or argument that the Hospital's negligence was a cause of Vaughan's death. We will not attempt to second-guess the jury's view of the evidence as to causation and will not attempt to speculate on the effect on the jury of the court's supplemental instruction.

**CONCLUSION**

{38}     We affirm the jury's verdict of lack of causation and the district court's judgment entered on the verdict in favor of the Hospital.

{39}    **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Chief Judge**


_____
**HENRY M. BOHNHOFF, Judge**